```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3

 4     RANDY CLEARY,

 5                    Plaintiff,
       -v-                                    Case No. 17-cv-14158
 6
       CORELOGIC RENTAL PROPERTY
 7     SOLUTIONS, LLC,

 8                    Defendant.
       _____/
 9

10          PLAINTIFF'S MOTION TO COMPEL DOCUMENTS, ET AL

11         BEFORE THE HONORABLE MAGISTRATE DAVID R. GRAND

12         Detroit, Michigan, Monday, December 10th, 2018.

13     APPEARANCES:

14     FOR THE PLAINTIFF:       IAN B. LYNGKLIP
                                SYLVIA BOLOS
15                              Lyngklip & Associates
                                24500 Northwestern Highway
16                              Suite 206
                                Southfield, MI 48075
17
       FOR THE DEFENDANT:       JEFFREY S. KOPP
18                              Foley & Lardner
                                500 Woodward Avenue
19                              Suite 2700
                                Detroit, MI  48226
20
       RECORDED BY:            EDDREY BUTTS, Case Manager
21

22     TRANSCRIBED BY:         David B. Yarbrough, CSR, RMR, FCRR
                               Official Court Reporter
23                             (313) 234-2619

24
               (Transcriber not present at live proceedings)
25          (Transcript produced from digital voice recording)
```

1                         TABLE OF CONTENTS

                                                              PAGE
2
     WITNESSES:
3
     NONE
4

5

6

7

8

9

10

11

12

13

14
                            EXHIBITS
15
     NONE
16

17

18

19

20

21

22

23

24

25

1            Detroit, Michigan.

2            Monday, December 10th, 2018.

3            At or about 10:12 a.m.

4                      --    ---    --

5            THE CLERK OF THE COURT:  All rise.  United States

6    District Court for the Eastern District of Michigan is now in

7    session, the Honorable David R. Grand presiding.  You may be

8    seated.  The Court calls case number 17-14158, Cleary versus

9    CoreLogic.

10            MR. LYNGKLIP:  Your Honor, Ian Lyngklip and Sylvia

11   Bolos on behalf of the plaintiff, Randy Cleary.

12            THE COURT:  Good morning.

13            MR. KOPP:  Good morning, your Honor.  Jeff Kopp on

14   behalf of CoreLogic.

15            THE COURT:  All right, thank you.  Good morning.  All

16   right, so the Court has before it a number of motions that were

17   set for hearing today.  The two motions to compel, the motion

18   to exclude undisclosed witnesses and then there was a motion

19   just filed the other day which I've reviewed regarding the

20   protective order and whether the defense has waived its rights

21   to object to the confidentiality, confidentiality challenges by

22   the plaintiff so let's start with the ones that are actually

23   before the Court starting with the motions to compel although I

24   intend to also take up that motion that was filed at least to

25   address it I should say.  Go ahead.

```
 1              MR. LYNGKLIP:  Good morning, your Honor.  Umm, I know
 2      your Honor's ready.  I've never been here and not have you be
 3      ready for the motions.  I'm not going to go back over what's
 4      already in the briefing.  I think that the high-level view is
 5      this, our interrogatories production requests were tendered
 6      July 6th.  We don't have any answers to interrogatories that
 7      are not objected to.  We don't even have a signature on any
 8      interrogatories.  Everything that we have asked of this
 9      corporation has been deemed objectionable including things like
10      identify the manager responsible for compliance with 15 U.S.C.
11      1681(p)(b).  It's the only claim in this case.  The compliance
12      manager's off limits.  The witnesses who have knowledge; not
13      relevant.  The, for purposes of production, their policies,
14      procedures and practices for assembling reports which is the
15      elements of the claim; not relevant.  Every single brief that
16      we've got in front of the Court right now claims that the
17      policies, procedures and practices to assemble these reports,
18      to match the data from whatever source was there to Mr. Cleary
19      not deemed relevant by this, by this defendant and so we find
20      ourselves in this situation where the disclosures where we
21      would expect to see support, documentary support and witness
22      support for policies, procedures and practices that are
23      reasonably assured to, to comply with the statute, to assure
24      maximum possible accuracy and in support of the two defenses,
25      the affirmative defenses, number three and number six which say
```

1    we followed procedures, there is no evidence disclosed.  There

2    is no evidence disclosed in their mandatory disclosures.

3    There's no witness identified.  When we ask about identifying

4    these materials and these witnesses in the interrogatories, the

5    answer is not relevant and when we ask for production, the

6    answer is not relevant.

7           THE COURT:  So I understand that and I understand

8    your frustration and I understand that they are two different

9    issues.  The one is or is not relevant and kind of what the

10   merits are and I understand what the plaintiff's objection to

11   what the defense has done and I'll address that.

12          MR. LYNGKLIP:  Sure.

13          THE COURT:  But I'm also trying to just understand

14   for myself kind of what happened here and what, what they

15   allegedly did wrong because as I understand it, the -- your

16   client is not the person who was convicted of these crimes or

17   charged with these crimes.

18          MR. LYNGKLIP:  Yes.

19          THE COURT:  And somebody had taken on his identity

20   including his Social Security number and, umm, my understanding

21   is what defendants did was gather information from

22   publicly-available sources and, and then just turn around and

23   report it so --

24          MR. LYNGKLIP:  Yeah.

25          THE COURT:  -- so what could they have done

1    differently and what, what did they do that is unlawful?

2         MR. LYNGKLIP:  I and that's a great question 'cause

3    obviously that's the core of what the proofs are going to be

4    here and why it's necessary that we're here today.  So, sadly

5    we had a late production from the defendants on Friday.  We

6    were attempting to printout several of these documents and for

7    technical reasons we were not able to get through that

8    printing, but there's one document and it is available to the

9    Court on the web.  Did you bring a copy?

10        MS. BOLOS:  I didn't, but we can e-mail it right

11   away, your Honor.

12        MR. LYNGKLIP:  To Mr. Butts, but let me give you a

13   description.  So the standard for conduct under the statute

14   following reasonable procedures to assure the maximum possible

15   accuracy requires that the defendants only use reliable sources

16   of information when they are assembling reports and then they

17   have to implement processes to properly match that data to the

18   right people so you might imagine a case for, for a person

19   named David Smith.  We actually had a person named David Smith

20   in a case in this court.  Lots and lots of David Smiths, so the

21   defendant not only has to go to a reliable source of data, but

22   then they have to be able to track that data to the appropriate

23   person.  So because there are lots of David Smiths, they have

24   to process to make sure they get the right David Smith's data

25   with the right file, okay?  So that's a two-step process.  The

1    first is the source of the data, the second is the matching

2    characteristics, all right, and those are all procedures,

3    policies and practices that every single credit reporting

4    agency maintains.  We've filed dozens, perhaps hundreds of

5    cases in this court and this is always the same issue when we

6    come to matching problems and identity theft problems.

7          So to answer your question directly, the source of

8    the data that they selected was a mystery to us and it's not

9    answered in this, in their interrogatory responses or in their

10   production.  At the initial meetings of counsel and throughout

11   the meet and confer process, defendant continued to maintain to

12   us that this data was given to CoreLogic by the Michigan court

13   system.  Now ostensibly you might think okay, perfectly

14   reliable source.  Not necessarily so, but that was what they

15   maintained throughout and you started pushing back on that --

16         THE COURT:  Maintained by what evidence?

17         MR. LYNGKLIP:  I'm sorry?

18         THE COURT:  What evidence was proffered to support

19   that that's where they got the information from?

20         MR. LYNGKLIP:  None, that is my point.  So they

21   wouldn't give us the evidence so what we did was we started

22   cutting subpoenas to the Wayne County Circuit Court, to the

23   courts all around the country that are reflected in the reports

24   that they issue about Mr. Cleary so they say that he got

25   convicted in Wayne County so we issue a subpoena in Wayne

1    County.

2              MS. BOLOS:  Auglaize County.

3              MR. LYNGKLIP:  They said Auglaize County, Ohio.  We

4    issued subpoenas that Auglaize County, Ohio, say show us where

5    you gave this data and as we started going through this and

6    noticing these deps, they backtracked on us and say you know

7    what, we didn't get it from the Court and this is just meet and

8    confers.  They then say that it was given to them by the

9    Department of Corrections.

10             THE COURT:  What do you mean given to them?  I mean,

11   nothing --

12             MR. LYNGKLIP:  The answer is I don't know.  That's,

13   it's an easy answer.  We are just finding --

14             THE COURT:  No, I know that's kind of why we're here,

15   but I'm just trying to get an understanding of what actually is

16   alleged even to have happened in terms of this case.

17             MR. LYNGKLIP:  Well, what's alleged to have happened,

18   our allegation is that it's not him and that it followed

19   improper procedures and if you will just bear with me a moment,

20   I will answer your question directly, I promise.

21              So we cut a subpoena to the Department of Corrections

22   and we took their deposition and the answer is no, they did not

23   give the data to CoreLogic.  So we finally got production last

24   after we filed this motion of some internal documents that bear

25   a brand that, and the brand is OTIS, O-T-I-S and what that

```
1     stands for is the Offender --
2              THE COURT:  I'm familiar with it.
3              MR. LYNGKLIP:  Okay, so and just so I can make it for
4     the record if you don't mind, I apologize, the Offender
5     Tracking Information System which is a system maintained by the
6     Department of Corrections for the state of Michigan.  So we
7     took their deposition, asked if they gave the data to
8     CoreLogic.  The answer is no, so that --
9              THE COURT:  When you say gave it to, OTIS is a
10    publicly-accessible website so they don't need to when you say
11    give it to, that's what I'm trying to understand.  Is there an
12    allegation that somebody else, some third party affirmatively
13    transmitted information or just that the defendants went on the
14    website and accessed it themselves?
15             MR. LYNGKLIP:  Those are two separate processes, both
16    of which are used by records vendors like CoreLogic and so when
17    an attorney says to me they gave it to us, it means some --
18    they have an agreement with some data provider to actually
19    package up a batch of data and transmit that batch of data to
20    CoreLogic.  That's what that meant to me.  We, we tried to
21    understand and get the evidence of this which is why we took
22    the deposition.  The answer that we got from OTIS was no, they
23    did not affirmatively provide the data to CoreLogic, they did
24    exactly as you said which is that they make that data available
25    on the public facing website which means that CoreLogic if they
```

1    are getting, getting their data from OTIS, it means that they

2    are doing what is colloquially known in the technology industry

3    as scraping data.  They have a bot that's going out and running

4    searches, blank searches across this database and pulling down

5    what data comes to them and then parsing that data and feeding

6    it into their own database.  That is not obtaining information

7    from a reliable source.  That is them scraping data and the

8    problem with this now that we are starting to actually get to

9    this, not with any assistance from CoreLogic mind you, the

10   documents that I, I was referring to that we can e-mail to Mr.

11   Butts are there are two disclosures on the OTIS system.  If you

12   go log on the OTIS system right now, in order to gain access to

13   that system, you must agree as a term of use that you

14   understand that the information is, A, not reliable and B,

15   should never be used for credit reporting purposes which is

16   what we're talking about.  So there's a warning on these

17   systems that the information is not reliable and the reason the

18   information is not reliable is that the OTIS system, the names

19   and the personal identification information is fed in directly

20   from the captioned information from the Michigan court system

21   which means if a person in Detroit who's been convicted of five

22   or six felonies and doesn't want to be recidivized,

23   habitualized and thrown away because they've got three strikes

24   and they're out.  They throw their wallet in the garbage and

25   they say my name is Joe Jones, whatever the name is.  That name

1    follows them throughout the system entirely and the captions of

2    the Court documents are not necessarily an accurate reflection

3    of the identity.  It's a well-known problem for both OTIS, for

4    the offender tracking system, for the Michigan court system,

5    for the federal, umm, information system, the NCIS database.

6    Everybody knows that the captioning facing documents of these

7    records are in and of themselves not always reliable and even

8    all the more so for the offender tracking system which is why

9    it is a term of use.

10           So to answer your question directly, what did they do

11   wrong?  Now that we know or we think we know where they got

12   this data from, the answer is they relied on an unreliable data

13   source.  They took data that they knew was not likely to be

14   accurate, they incorporated it into a database which requires

15   that they have procedures and follow procedures to assure

16   maximum possible accuracy.  Taking data from a database like

17   that which is riddled with facially wrong information without

18   verifying which is exactly what is required under the terms of

19   use.  It has to be verified with the ICHAT system which is the

20   Michigan State Police's system, has to be verified through

21   there before it's relied on.  They don't do that and how do we

22   know we don't do that?  'Cause we went and took ICHAT's

23   deposition as well and they do not verify and get data from

24   ICHAT.  So when would look at ICHAT and we went to ICHAT and

25   asked them to run Mr. Cleary back through ICHAT, the answer is

1    Mr. Cleary has no criminal history and all that would have

2    taken for CoreLogic to do is to follow the terms of use which

3    they apparently must have agreed to.  We don't know how they

4    technologically got it or whether they had people sitting there

5    data processing or whether they had a bot running.  That's

6    information that we're trying to get out of this discovery

7    production here of the interrogatories.  That's the first part

8    of it.

9           The second part of it is that all of the convictions

10   that are in the OTIS system and mind you OTIS does not, is not

11   a permanent record, it only follows offenders who have been in

12   the correctional system within the preceding three years.  So a

13   prisoner who's been released three years ago is no longer in

14   that system.  A prisoner who was sentenced to do county jail

15   time, not in that system.  Only if they come into the

16   Department of Corrections which means prisons, felonies and

17   only for three years.  Anyway, if you look that data, the

18   underlying data at least that we saw that was available, the

19   names that are associated with that are not Randy Cleary.

20   They're all associated with a person named Randy Reeds

21   (phonetic) which is the name that the identity thief assumed.

22   Mr. Cleary, I can't remember what year, but some time around

23   the 2000s, Mr. Cleary literally changed his name to avoid this

24   problem.  The identity thief didn't know it so he kept using

25   the old name Randy Reeds.  So the question is to that second

1    prong of that test that I was telling you about before, first

2    prong is reliable source of data.  Second one is proper

3    matching algorithms to make sure that the data matches.  So if

4    you look at the data for this identity thief whose true name is

5    Benny Parker, none of the data that he gave the police for any

6    of the convictions that are in the OTIS system actually match

7    Randy Cleary because Randy Cleary changed his name and he

8    didn't know that.

9         So the question is how is it that these people and

10   meaning CoreLogic, how is it that CoreLogic is following

11   reasonable procedures to assure the maximum possible accuracy

12   when they're relying on a database which is facially inaccurate

13   and they match somebody who doesn't have all the same personal

14   identifiers and if you see that the names don't match, umm, if

15   you and I were to sit down with to sets of records and look at

16   two sets of records where one record says Randy Cleary and the

17   other says Randy Reeds, we would look at that and we would say

18   ah, there's a discrepancy there, that's notice to me I need to

19   do more research and figure out whether the same.  That's not

20   what with we see CoreLogic doing.  What we see them doing is

21   basically disregarding the differences, completely throwing

22   them away and only looking for the matching algorithms and

23   saying good enough, on the report it goes.  That's what they

24   did wrong.

25        THE COURT:  Okay.  That was a good, long answer, but

1    I appreciate in it.  That's a compliment.  I appreciate that.

2         MR. LYNGKLIP:  I just trying to -- I know that we

3    haven't seen you on these cases, but did that answer your

4    question directly?

5         THE COURT:  Yes, no, I really appreciate that as I

6    said.  So that does give me some better insight into a lot of

7    what you're asking for which seems frankly relevant to those

8    points, but why do you need things like past and present

9    contracts between CoreLogic and its furnishers of public record

10   information if we know, if you know right now that the way they

11   claim to have gotten this was through the process you just

12   described --

13        MR. LYNGKLIP:  Yep.

14        THE COURT:  -- why do you need things like their past

15   and present contracts with other furnishers of public record?

16   I mean, I don't even know --

17        MR. LYNGKLIP:  Yeah, that's great question and okay,

18   so let me go back so that you understand what that is actually

19   requesting of them.  So in the credit reporting, umm, under the

20   statute, there are three different kinds of parties who are

21   regulated by the statute.  There's the credit reporting

22   agencies, in this case CoreLogic.  There are data users.  Data

23   users are people like the people who receive the report, the

24   landlords that turned Mr. Cleary down for a tenancy and then

25   there is data furnishers.  Data furnishers are people who

```
 1    voluntarily agree to provide data or as in the word that you
 2    used, give data to CoreLogic.  There's an ongoing relationship
 3    and they are regulated under the statute.  Now if for instance
 4    the Department of Corrections had agreed to provide data to
 5    CoreLogic, then they would be a data furnisher for purposes of
 6    the statute and in that instance there would be notice to all
 7    those data furnishers of the -- there's mandatory statutory
 8    requirements of a notice that goes to them about providing
 9    accurate data and part of the procedures that the CFPD and the
10    Federal Trade Commission have promulgated say when you board or
11    sign up new furnisher, you have to make sure that they're
12    giving you good data and that they know that they're giving
13    good data and that is why it is so absolutely critical that we
14    find out whether or not there's a relationship as counsel for
15    CoreLogic claimed to us, that there's a relationship between
16    OTIS and the Department of Corrections so --
17              THE COURT:  So that's fine, but that doesn't get to
18    why you're asking for all with -- it says all present and past
19    contracts --
20              MR. LYNGKLIP:  In which production request, your
21    Honor?
22              THE COURT:  It's number seven -- I'm sorry, eight,
23    all present and past contracts between CoreLogic and its
24    furnishers of public record information.
25              MR. LYNGKLIP:  Yep.
```

1           THE COURT:  That could be, I'm assuming that could be

2    hundreds of entities all throughout the country that have

3    nothing to do with, with this, so --

4           MR. LYNGKLIP:  That is absolutely correct your Honor

5    and --

6           THE COURT:  Why do you need all of that?

7           MR. LYNGKLIP:  The answer is that is what we would

8    call pattern and practice evidence.  So part of the claim here

9    is, number one, that they are, umm, going out and

10   affirmatively -- to compare the situation we have with what

11   would normally be expected.  If there was a true data

12   furnisher, those data furnisher contracts would notify those

13   furnishers hey, your information has to be accurate, you've got

14   to verify it before you send it to us, you have to warrant that

15   it is true and accurate.  Compare that with what they do with

16   the Department of Corrections and the answer is they do nothing

17   to correct or verify this data that they may be getting on

18   their own.  So that pattern and practice evidence would be

19   relevant and I think you're assuming something that is, is

20   again at issue for this very motion which is I don't know that

21   they have any rec -- any furnisher contracts with any public

22   entity.  In other words, I think and this is why I would love

23   to see what we have asked for in the motion which is if they're

24   claiming that this is unduly burdensome because we have perhaps

25   asked them to produce reams and reams of furnisher contracts,

1   they haven't said that.  They may not have any furnisher

2   contract with public records suppliers.  They may not have any

3   furnisher contracts with any courts or correctional systems at

4   all which would also in and of itself be a very fruitful topic

5   of discussion between myself and their 30B6 representative when

6   I sit down with him, why don't you actually buy this data?

7   What do you have to do with this data if you're not getting it

8   from furnishers?  So this is the kind of thing that we would

9   expect to see in a declaration or an affidavit or a document

10   submission by the, by CoreLogic saying hey, we have over 50,000

11   data furnishers, do you really want that?  If they had said

12   that to me, my answer would have been no, I don't need that.  I

13   don't need 50,000 contracts.  That would be unreasonable to

14   produce and I couldn't winnow through it, but that has been a

15   black box.  We have gotten no information from CoreLogic or

16   their counsel about what's actually at issue.  It may be that

17   what's needed is all, all that's needed is a template document

18   that they use and any standardized variations that they have

19   perhaps and any ones that are applicable in this case.  I don't

20   know what's, what they have because they haven't told us.

21   Their answers give us none of this.  Certainly whatever is

22   there, you know, their relationships with other data furnishers

23   is relevant by comparison to the conduct that they've engaged

24   in in this case.  What's reasonable under the circumstances and

25   what is proportionate to the needs of the case, I don't know

1    because again we don't have that declaration of undue burden

2    here in front of the Court and I think that's the one thing

3    that we should absolutely get to.  That's, umm, if that's a

4    sticking point for us.

5            THE COURT:  All right.  And so would your comment be

6    the same for number 10 which asks for any document identifying

7    every source that you've used to acquire criminal or public

8    information, record information from any court and like again

9    that does strike me as potentially, umm, ex -- you know, that

10   what would be responsive to that I would assume would be

11   extremely voluminous and I guess I don't know, but --

12           MR. LYNGKLIP:  That's exactly or point which is that

13   I, you know, I, umm, yeah, defendant obtain relevant info --

14   umm, yeah.  I would think that for purposes of this case, their

15   response says and I'm going to quote from their response:

16           "As noted above defendant obtained the

17           information relevant to defendant's

18           consumer report in question from the

19           referenced courts."

20           That's their response.  They say they got this

21   information from the courts.  At minimum I would think that we

22   would be entitled to those relationship documents as to the

23   courts that they got this from, but I don't think given our

24   subsequent conversations that those actually exist and I don't

25   think there's any documents that exist for any other courts and

1    all I'm trying to do here really I think is to put the lie to

2    what we've been told which is we're being told that they're

3    getting this data from courts and that courts are affirmatively

4    acting or operating as furnishers for purposes of the statute.

5         THE COURT:  Why not ask them if in an interrogatory

6    do you have contracts with --

7         MR. LYNGKLIP:  Judge, the answer is I could do it

8    with an interrogatory, but if there aren't any contracts, their

9    response to this would be the thing that I would normally

10   respond which is there are no such documents that exist.  That

11   gives me something that's admissible and we can do that in a

12   meet and confer, but they won't give us this information or

13   somebody who's knowledgeable about what's going on.  So again,

14   you know, umm --

15        THE COURT:  All right.

16        MR. LYNGKLIP:  -- at minimum I would think that the

17   documents that they're referencing in relation to the courts

18   for Mr. Cleary would be, umm, would be fair game and certainly

19   appropriate to the needs of this case.

20        THE COURT:  All right.  Anything else on this

21   particular motion?

22        MR. LYNGKLIP:  Umm, we're talking about the

23   production?

24        THE COURT:  Right.

25        MR. LYNGKLIP:  Umm, I think that the only, the only

1   capstone that I would give you is this and this was in our
2   reply brief.  The procedures that we need are all the
3   procedures that they've got in relation to preparation of these
4   reports.  We've received a supplemental production from the
5   defendant, about 200 odd pages roughly of policy and procedural
6   manuals relating to disputes.  That is not the preparation of
7   the report, it is not at issue in this motion and the fact of
8   the matter is that the policies, procedures and practices for
9   assembling reports and vetting data sources like OTIS, whatever
10  they are, whether they're going to be scraping them, I don't
11  think that they get the option of cherry-picking the evidence
12  that they want.  I see this, this motion is being, you know,
13  two pronged; namely, they haven't produced them in their
14  disclosures or identified them in their disclosures.  I don't
15  think that they get the opportunity to withhold these documents
16  from us and then produce documents or witnesses to support
17  policies, procedures and practices that are relevant to this
18  case.  If they want to talk about that, that's fine, we need to
19  see that before hand and they don't get to cherry-pick which
20  ones they get to produce and say oh, these ones are helpful for
21  us about, umm, about our data sources.  We need to see
22  everything and either we've got to see all those policies,
23  procedures and practices or they've got to be barred from
24  producing people, umm, producing documents and I think that
25  certainly under the best evidence rule if they're going to talk

1    about these, then, you know, they're going to have to produce

2    these documents at trial.  They can't just have a witness come

3    up and take the stand and say we have the best policies and we

4    comply with everything.  Those have got to be in front of the

5    trier of fact and I think that that is the most important thing

6    that I get to you for this.  The only other question I would

7    ask you is are you comfortable that we have provided enough

8    authority in relation to things like financials and other cases

9    and pattern and practice?  Do you have any questions for me

10   about those because I know those are typically ones that are

11   more difficult for the Court.

12           THE COURT:  No, I don't have questions about that.  I

13   more just had questions about, I mean, the fact that we have so

14   many requests and I'm hoping to avoid needing to go through

15   them and rule on them one by one by one and hoping to give you

16   kind of a, a ruling that would apply that hopefully you could

17   go through yourselves, but I don't know if that's going to be

18   possible just in light of the, you know, the nature of how you

19   you all have, you know, gotten to this point.  So let me just

20   hear from the defense and then we'll see how we might be able

21   to efficiently rule on the motions.  All right, go ahead.

22           MR. KOPP:  Good morning.  So your Honor, you know,

23   this case was a, is basically a rehash of the 2014 case that

24   Mr. Cleary brought against, in the case of

25   Cleary v. Daniel Haynes where he sued the Department of

1    Michigan Secretary of State, the Department of Corrections and

2    others and in that case, you know, the Court ended up

3    dismissing the case because, you know, Mr. Cleary was

4    previously known as Randy Reeds and in that, umm, and so he had

5    two other names before he was the current Randy Cleary.  The

6    information that was reported by the records indicated that it

7    was accurate information based on the conviction of Randy Reeds

8    which was the plaintiff's name prior to him changing it with

9    the same birthday.

10          Now in this case, they've asked us for a plethora as

11   you correctly pointed out of information that's not relevant to

12   anything and I'll tell you why.  CoreLogic obtained the

13   information that they reported to the housing, the housing

14   company through OTIS.  We gave them the raw information that

15   showed the information that was reported directly from the

16   court records with the maximum accuracy of those records showed

17   Randy Reeds being convicted in Ohio and in Michigan with the

18   same birth date as the plaintiff and the fact that he never

19   went and disputed that information, you know, to this date he's

20   never filed an identity theft affidavit or anything like that.

21   So what they're trying to obtain is all of the algorithms and

22   the  other proprietary confidential information that's behind

23   the scenes in how we, how CoreLogic gets the information from

24   OTIS which isn't disputed, we've got the information which

25   we've already provided to them and given them the information

1   that we've reported.  So if there is a violation of the Fair

2   Credit Reporting Act, on its face there's a violation.  You

3   don't have to go behind and obtain all the contracts with

4   vendors or anyone else or, you know, the other categories of

5   documents they're asking for, their financial information and

6   all this other stuff that's really not relevant to the claim

7   which is did we or did CoreLogic provide accurate or inaccurate

8   information.

9         THE COURT:  But first of all as of the filing of this

10  motion, the plaintiff didn't know any of that it sounds like

11  because that was all just provided, okay?  So you can't then

12  say oh, what are we doing here.  They filed the motion because

13  none of that had been provided.  Maybe had that been provided,

14  we wouldn't be here on all of these issues, I don't know, and

15  secondly --

16        MR. KOPP:  No, Judge, he knew when he was denied the

17  apartment, the copy of his credit report was provided.

18        THE COURT:  Yes, but he doesn't know how -- he didn't

19  know about OTIS I don't believe or that your client, that

20  that's how they supposedly obtained it and now we have these

21  issues that counsel's raised about well OTIS says that you

22  can't rely on it.  I don't know if that's, you know, if that's

23  true or not, but, umm, the, umm, you know, but the discovery --

24  they're certainly entitled to discovery about what happened, at

25  a minimum about what happened here and what policies and

1    procedures were in place that guided CoreLogic in whatever it

2    did and I guess I --

3            MR. KOPP:  Right.  For Mr. Cleary's case, I don't

4    have a problem with that.  If we, we limit it to what did they

5    do in this case with respect to obtaining information from

6    OTIS, how did they get that information and applied it to

7    Mr. Cleary, that's one thing, but they're asking for, you know,

8    every vendor or every situation of how they, they process and

9    what their algorithms are.  That's way overly broad.

10           THE COURT:  Oh, I understand it could be, but it

11   might not be, I don't know.  When you say algorithms, I assume

12   somebody types in a name and hits enter and it goes OTIS and,

13   you know, you type in the state and, I mean, I don't know.  I

14   think that's one of the issues and the other issue is like

15   counsel raises, you know, he doubts that there are any of

16   these, umm, relationship contracts with courts or with, you

17   know, offender systems and if that's the case, then there is no

18   burden.  Then really the answer is no such documents exist.

19           MR. KOPP:  So we provide an amended response like I

20   said on Friday to that particular request, number 10.  He read

21   the old request.  In the new request, we made it very clear

22   that we objected because we believed it was harassing and undue

23   burdensome, unduly burdensome.  We've produced a copy of the

24   raw data received regarding plaintiff which identifies the

25   source of information and the exact information reported in the

1    public record.  They take the record from OTIS which is what

2    OTIS is reporting and they, that's what they identified and

3    provided.  So to go beyond that, you don't -- there's no need

4    to go beyond that and go into the mechanisms behind the scenes

5    of what's going on with the -- how they, they apply the

6    information when it's not disputed that they got the

7    information from OTIS to make the report.

8              So, you know, Judge, again with the financial

9    information, they're asking for every lawsuit that CoreLogic's

10   ever been sued on.  I mean, there -- it's just, it's a fishing

11   expedition frankly to go well beyond what is required in --

12             THE COURT:  But for instance, okay.  So, you know,

13   I've just never seen briefing like this.  Frankly, I'm just

14   really surprised to receive the defendant's briefs like this

15   because for example the plaintiff cites a series of cases for

16   the proposition that if other consumers have lodged similar

17   complaints, that it could be relevant to the issue of

18   willfulness and they cite Dalton which is a Fourth Circuit case

19   and they cite a couple of other cases at least one of which was

20   within the Sixth Circuit and defense's brief, you don't discuss

21   any of those cases.  You don't say, you don't analyze any of

22   the legal issues.  You just essentially say oh, well we're

23   going to win on summary judgment so don't make us go through

24   discovery.  Well, then file a summary judgment brief.  Maybe if

25   I saw a summary judgment brief was on file and I read it or a

```
 1   motion to dismiss was on file and I read it and I thought wow,
 2   this really looks meritorious and I really don't see the need
 3   for discovery to be able to answer these legal questions, maybe
 4   I'd enter an order, you know, denying you without prejudice
 5   until that's resolved, but none of that's on the record.  Your
 6   entirely brief was essentially saying we're going to win
 7   summary judgment so don't make us, don't make us engage in
 8   discovery and that's just extremely inappropriate and I really
 9   am very surprised to see that from defense.
10              MR. KOPP:  All right.  Well, fair enough.  Fair
11   enough.  I do think that that's partly the position that we're
12   taking I guess is that there are, there really is not a
13   meritorious claim that probably has to get resolved on, on
14   summary and, you know, this --
15              THE COURT:  But you do summary after the --
16              MR. KOPP:  I understand, but the level of discovery
17   that they're asking for is so overly broad and unduly
18   burdensome and that, you know, it's --
19              THE COURT:  Well, I don't know if it is.  I agree it
20   could be, but if it actually only involves a handful of
21   documents or a couple hundred pages of documents or even a
22   couple thousand pages of documents, then I would disagree and
23   without some kind of affidavit saying we have, you know, 1,000
24   of these contracts and they comprise, you know, X number of
25   pages or, you know, some level of specificity about why it's
```

1    burdensome, I can't conclude that it's burdensome.  I mean, I

2    agree it sounds like it, it might be, but counsel's proffered

3    his belief that it actually is more likely that it's going to

4    be very non-burdensome.  I don't know.  So I, I mean, I guess I

5    don't know what I'm supposed to do with this.  I mean, I want

6    it to be efficient and I want it to be tailored to what's, you

7    know, really necessary, but I can't, I can't just not allow

8    discovery because the defendant says we're going to win summary

9    judgment and --

10          MR. KOPP:  Fair enough.  So we have not had a meet

11   and confer on the specific issues that they're addressing.

12   They filed their motion to compel right away.  We tried to have

13   this, these conversations with them to try to say well look,

14   why are you asking for this or why are you not asking for, you

15   know, or what our position is and the position is well, we're

16   not, you know, we've already beat that horse is what I've

17   heard.  So, you know, we're left with having to come before

18   your Honor to try to, you know, resolve this without having

19   properly went through the whole meet and confer process.

20          THE COURT:  Well, that's why I arrange phone calls

21   with you guys to try to avoid being here and we're still here

22   and then I would have expected to see, you know, briefs that

23   helped me to actually resolve the issues on the merits and I

24   really, there's really nothing from the defense for me to do

25   anything with and, you know, I don't want to just say well the

1    defense didn't give me anything so therefore it's just like the

2    wild west and whatever they asked for, 100 present produce it

3    if that's really not necessary, but there's -- I kind of don't

4    have much of a choice on that other than, other than if you go

5    through anything in particular and you can point to me and say

6    well this one in particular is really, umm, excessive and

7    here's why.  I don't know if you're prepared to do that on any

8    of these.

9         MR. KOPP:  I'm not right now, your Honor, honestly,

10   but, you know, I would be happy to sit down with the other side

11   and go through them one by one as we have on some and produced

12   certain policies.  Like he said, we produced identity theft

13   procedures and dispute procedures that are what would happen if

14   Mr. Cleary had decided to, you know, object to or, you know,

15   question or dispute the identity report.

16        THE COURT:  Well Mr. Lyngklip said the issue from

17   their perspective isn't a dispute procedure, it's the

18   procedures that were involved in the preparation of the

19   reports.

20        MR. KOPP:  Right and what I said before, your Honor,

21   I think is the answer to that is that there is no dispute that

22   CoreLogic got the information that was publicly reported by

23   OTIS.  They've provided that to Mr. Cleary and it shows where

24   the report or where the information came from.

25        THE COURT:  But how did they get that?  How did they

1    get it?  Was there a human being that, that, okay, but they're

2    entitled to discovery on that so that they can be able to

3    present it to the Court and say, umm, you know, the defense is

4    relying, here's the defense's summary judgment motion where

5    they say oh we got if from OTIS and they're entitled to

6    discovery to show affirmatively there wasn't a human being that

7    looked at it, there wasn't a human being a clicked on it, there

8    wasn't a human being that read the disclaimer and they're

9    entitled to, you know, the discovery necessary to prove those

10   things.

11         MR. KOPP:  Right and so they have the corporate

12   representative of CoreLogic's deposition scheduled for December

13   18th.  They have the opportunity to ask those questions during

14   that corporate representative's deposition.  They believe that

15   that's important for their case.

16         THE COURT:  But they have a right to ask informed

17   questions based on the documents that are supposedly what has

18   guided CoreLogic's procedures and then see if what happened --

19   what if what happened was different than the procedures?  What

20   if CoreLogic has a procedure that says whenever you're dealing

21   with criminal matters, here's the procedures we must follow, we

22   must have an actual eyes on the thing, we must compare the

23   photograph in OTIS to the driver's license photo.  I mean, I

24   don't know what it says and let's just assume that's the

25   procedure and then CoreLogic and then they depose the guy in

1    the 30B6 and they say well no, we didn't follow that procedure.

2    All right, well then that's how you, that's how you, you know,

3    prove a case and it just seems like CoreLogic's frankly

4    preventing them from being able to, you know, make their case

5    to the best extent they can and I agree, when I read a lot of

6    these, it did strike me as very broad, but I don't know

7    unless -- I don't know exactly how broad it is until there's

8    some kind of proffer that shows that it is that broad and that

9    shows that it is that burdensome and that hasn't been shown.  I

10   think you had, you know, agreed with that and so I would hate

11   to make an order that requires just a tremendous amount of

12   excess, you know, work and documents and trees being destroyed,

13   but I haven't been shown that that's, that that's what's going

14   to happen if I grant this motion.  So I don't know, unless you

15   have anything else to add?

16           MR. KOPP:  Umm, no, your Honor.

17           THE COURT:  All right.

18           MR. LYNGKLIP:  If I may?

19           THE COURT:  Yes.

20           MR. LYNGKLIP:  Mr. Butts was kind enough I was able

21   to get those disclaimers, if I can approach?

22           THE COURT:  Sure.

23           MR. LYNGKLIP:  Thank you.  Got a copy for Mr. Kopp as

24   well.

25           THE COURT:  I've got to say I've used OTIS from time

```
1    to time and I've never seen it, but I don't doubt you, but --
2    I'm not using it for any credit reporting I know.
3            MR. LYNGKLIP:  No, but this is how everybody gets
4    through this.  This is the general way.  There's a second
5    exhibit underneath which is a little more explanation.
6            THE COURT:  All right, so what am I looking at?
7            MS. BOLOS:  The red box, your Honor.
8            MR. LYNGKLIP:  The red box that's the disclaimer
9    there which reads Department of Corrections of the Michigan,
10   state of Michigan offer this information without any express or
11   implied warranty as to its accuracy.  The information on the
12   database may not actually reflect the most current location
13   status, projected release date or other information regarding
14   an offender.  Although every effort is made to maintain
15   accurate records, no action should be taken as a result of
16   information found herein without confirmation with the MDOC,
17   the Michigan State Police through the use of the Internet
18   Criminal History Access Tool ICHAT or review of the court file.
19   The Michigan State Police ICHAT can be found and there's a web
20   link and the reason that this is important is that last
21   sentence which says or review of the court file, that is in
22   conformity with FTC opinion letters concerning credit reporting
23   and consumer reporting databases.  As I'm sure the Court knows,
24   the docket sheet for this court and any other court in the
25   state of Michigan and any other court in the country are
```

1    intended to be high-level reviews or summary information of

2    what has happened in court.  Courts speak through their orders,

3    not through their dockets and so the FTC has required before

4    anybody can use a background check for purposes of employment,

5    that they have to go into the court record and review the

6    actual sentencing documents because so often the registry of

7    actions or the docket sheets don't actually reflect what's

8    going on and to the extent that OTIS is itself scraping data

9    from the Michigan court system's docket sheet and not from the

10   underlying records of conviction or the formal documents that

11   identify the offender which would normally be the PSI, the

12   presentencing investigative report.  They identify, they do

13   every effort, make every effort at that point to really and

14   truly identify people using fingerprint biometric matches.  The

15   state of Michigan knows that this information is not

16   potentially accurate and that identity thefts happen all the

17   time.  It's in the deposition that Ms. Bolos took.  She asked

18   about it, so there's another page there, but we don't need to

19   belabor that.

20           The other thing that I think I would point out is,

21   umm, there has been much made of the fact that we have not met

22   and conferred with this defendant.  We have gone Herculean

23   lengths to apprise them of our position in relation to this

24   discovery.  Ms. Bolos spent almost an entire billable day

25   trading phone calls between Mr. Kopp and Mr. Attawa (phonetic)

1    and in their own e-mail back in October, Mr. Attawa scolded us

2    for deciding to move to compel given quote "our substantial

3    good faith at meet and confer efforts".  It's an exhibit to

4    your Honor's, it's exhibit 33-3.

5          We have reached out and the problem has not been at

6    least from our side as we view it has not been that we've

7    failed to act.  It is simply that we do not have counsel that

8    has made a reasonable investigation into the documents and

9    information available and the rejoinder comes back every time

10   well we haven't met and conferred, we just have to get more.

11   We're on a timeline here and the reality is I'm sitting down

12   with a 30B6 deposition witness a week from today and -- not a

13   week from today, on the 18th.

14         MS. BOLOS:  Yes, a week from tomorrow.

15         MR. LYNGKLIP:  A week from tomorrow and if your Honor

16   was to devote his efforts and good offices of this Court to

17   nothing about writing this opinion between now and then, I

18   don't see any documents coming our way in time for that

19   deposition, that positional deposition and I don't see any

20   conceivable way that I get ready for that deposition.  We have

21   an extension of discovery, but again, you know, allowing time

22   for an opinion and a reasonable amount of time for production

23   of documents, we have a very serious problem here and this is

24   not for lack of our, our efforts at attempting to secure this

25   voluntarily and to the extent that this defendant has

1   voluminous documents that your Honor wishes them to produce or

2   produce some evidence of, we have never been short of the

3   willingness to meet and confer.  I don't need documents, I

4   don't need a million documents on my desk that are going to

5   only make it more difficult for me to winnow through it and

6   find what's at issue in my client's case.  We need to have

7   either, you know, a fulsome production in time to do what we

8   need to do or we need to just cut this off and move on with

9   what we can get in the time that we have remaining and that is

10  the concern that I have as, you know, somebody who's got to be

11  getting on planes and going places to take depositions because

12  this deposition, this is only the first, you know.  This is

13  just very high level trying to find out what they have and what

14  they've been keeping from us and who may actually know what we

15  need to know and then I think the only other thing for your

16  Honor to keep in mind is there's also a, at issue in this case

17  in terms of relief a request for injunctive relief and so that

18  was the subject of an early Rule 12 motion and --

19          THE COURT:  Yes, you saw it.

20          MR. LYNGKLIP:  Yeah, exactly and so there wasn't much

21  by way of a legal principles that we can do, you know, extract

22  from that, but we know that we're moving forward on and the

23  test for injunction is going to be the test for any other

24  injunction which is is this defendant doing what they're doing

25  willfully and are they going to keep doing what they're doing

1   in the absence of a court order and so much of the documentary

2   proof that we've asked for is directed not only at willfulness,

3   but will also be directed or used, useful for determining

4   whether or not we need to have an injunction to stop them from

5   using inappropriate data sources like the OTIS database and

6   that seems to be where that request for relief is actually

7   heading right now is to ask them to, umm, to request that the

8   Court enjoin them from ever using OTIS again unless they verify

9   it with ICHAT as is directed by the terms of use.  So that's

10  all we have on the motion.

11          THE COURT:  All right.  So all of these ones that are

12  objected to are in dispute?

13          MR. LYNGKLIP:  We did receive a production and I

14  think one of the things that's not in dispute is an

15  organizational chart.  We do have that organizational chart.

16  It does look like it's an appropriate organizational chart, RTP

17  number four.  We received a dec sheet for an insurance policy

18  and while I understand it's something, it is not what is

19  required by either Rule 26(a)(1) or our request for production.

20  We asked for the actual policy.  We're entitled to that and

21  there's reams of case law that we can provide on dec sheets

22  under Rule 26(a), it's just not appropriate.

23          They have given us screen shots and I think that's

24  number one actually?  Yeah, it's number one, one and two, they

25  provided us screen shots from the consumer relations system.  I

1    don't know if it's complete, but certainly I take them at their

2    word that it is now complete.  We will be asking about whether

3    there are other screen shots available, but I think that that's

4    fairly well resolved as of Friday.

5           They have given us dispute manuals, four manuals,

6    about 200 pages.  Unfortunately those are not actually at issue

7    in this motion, that we did request those documents in our

8    request for production.  I think it was number 34.  We chose

9    not to move forward on that to move to compel.  We are looking,

10   you know, our motion is directed at data acquisition, data

11   vetting, matching of --

12          THE COURT:  So do we need to go through -- I mean,

13   because I don't want to write an opinion on this, I want to

14   just give you a ruling and get you going with this 'cause we've

15   already taken, there's already been too much time spent on this

16   issue.  So let's just go through them that are in issue in the

17   motion.

18          MR. LYNGKLIP:  Sure.  All right, do you want to go

19   item by item through what I've got in the motion or do you want

20   me to look at the request for production?  The actual requests?

21   I mean 'cause --

22          THE COURT:  Let's just look through the request for

23   production.

24          MR. LYNGKLIP:  Okay.  All right.  Again, I think as

25   to number one, I believe we have that.  I will take Mr. Kopp at

1    his representation if he wants to make one to the Court that we

2    have all the documents that would conform to that.

3              MR. KOPP:  I believe we've produced his file.

4              THE COURT:  All right, one two should be the same.

5              MR. LYNGKLIP:  Yep.

6              THE COURT:  All right.

7              MR. LYNGKLIP:  Identity theft manuals, I don't know

8    that we have a complete complement of that.  I know that

9    there's some reference to identity theft in the dispute

10   manuals, but we do not have anything else relating to identity

11   theft besides I think one manual out of four.

12             THE COURT:  All right.  Well, three will need to be,

13   I'll grant as to three.  I'm just going give you a ruling as to

14   each and every one of these that's in dispute.  So three will

15   be granted.  Four is already resolved it sounds like.

16             MR. LYNGKLIP:  Correct, your Honor.  Financial

17   documents, we have nothing.

18             MR. KOPP:  Judge, and that's, again they're asking

19   for tax returns, shareholder reports, well beyond the scope of

20   anything that's relevant to any, anything --

21             THE COURT:  Is CoreLogic part of a public company?

22             MR. KOPP:  CoreLogic is, umm, I don't know if --

23   CoreLogic Rental Property Solutions, LLC is a sub of CoreLogic

24   parent.

25             MR. LYNGKLIP:  And it is traded or at least it was to

1    the last time I looked on the EDGAR database.

2              THE COURT:  So what of the financial, umm, let's see.

3    Are those documents filed with like an entity like the S.E.C.

4    or something --

5              MR. KOPP:  A corporation deposit 10K annual, but, you

6    know, why would -- annual income statements, annual balance

7    sheets?  How is that relevant to any claim in this case?

8              THE COURT:  Well, it goes to the issue of punitive

9    damages if they are, if they should -- if there should be an

10   award.  I mean, sometimes these things are bifurcated, but if

11   they are publicly available, I don't understand what the

12   problem is.

13             MR. KOPP:  Well, I guess it works both ways.  I mean,

14   if they're publicly available, then they can obtain it

15   publicly.

16             THE COURT:  But are they publicly available or not?

17             MR. KOPP:  I think that CoreLogic, the parent files

18   a 10K.  I'd have to confirm that for sure, but I believe they

19   do.

20             MR. LYNGKLIP:  Your Honor, here's the difficulty.

21   It's not just willfulness.  This is part of the Constitutional

22   test for excessive punitive verdicts and so if we wind up with

23   a punitive damage award, one of the ways that the reviewing

24   court and by the way, the review at the Court of Appeals level

25   is de novo, very unusual, but it is de novo in all respects

1   even after a remittitur.  The <u>Gore v. BMW</u>, <u>State Farm v.</u>

2   <u>Campbell</u> all require that the courts take into consideration

3   the net worth of the company and as part of its analysis of the

4   reprehensibility and economic --

5           THE COURT:  No, I know understand all of that.  It's

6   just a question of do you need them to provide this to you or

7   can you get it.

8           MR. LYNGKLIP:  I need them to provide it because I

9   don't think that the child corporation is filing its documents.

10  They are reporting them up to their publicly-traded parent

11  company, CoreLogic, but those may not be available and I have

12  to fish through them.  They've got them.  They can produce them

13  and whether they're publicly available, again if you want a

14  supplemental brief on that, I know you don't, but if you do,

15  I've got plenty every case law that says the fact that the

16  documents may be publicly available does not relieve them of

17  the burden of just going to their files and getting it for us

18  and turning it over.  On the other hand if we don't get this,

19  there's a Fourth Circuit case, the <u>Doetry</u> (phonetic) case where

20  Aquin refused to produce its subsidiaries materials and we

21  might be able to use the CoreLogic parent company documents as

22  a measure of punitives.  I think that what will happen

23  ultimately is if we don't get this, they're waiving any

24  argument, any claims of Constitutional excessiveness as to

25  punitive damages which is why I think it's, you know, to not

1    have this in front of the Court is effectively embedding in our

2    trial or whatever proceedings come later arguments about

3    Constitutionality and waiver that I don't think we want to deal

4    with.  I -- they have these documents.  They have to report

5    them to their parent.  They've got to have them neatly

6    organized and we need them.

7         THE COURT:  All right.  I'm going order them to be

8    produced.  I think that if CoreLogic's parent company is

9    publicly traded, I think that this has got to be, umm, very

10   readily available and probably part of the disclosures anyway

11   and even if it's not, it can be designated as pursuant to the

12   protective order as, you know, as confidential and to only be

13   used as part of this litigation.  So the Court will grant those

14   to five as well.

15        MR. LYNGKLIP:  Number six, I believe that they've

16   tendered those with their first batch of production, the

17   subscriber agreements.  Have we got complete copies, Mr. Kopp?

18        MR. KOPP:  Yes.  Well, for the --

19        MR. LYNGKLIP:  Right, those were the two we get and

20   that's all we asked for.  Six is not needed, it's resolved.

21        THE COURT:  All right.  Seven relates -- so seven

22   relates to the --

23        MR. LYNGKLIP:  Same thing.

24        THE COURT:  -- specific entities in question here.

25        MR. LYNGKLIP:  Correct and we, we just didn't know if

1    there were other entities that might have received and I'm

2    accepting Mr. Kopp's representation that there are no other

3    companies that got it.

4              THE COURT:  All right.  So seven's resolved as well?

5              MR. LYNGKLIP:  Correct, your Honor.

6              THE COURT:  All right.

7              MR. LYNGKLIP:  The furnishers which is the material

8    that you indicated.

9              THE COURT:  All right.  Eight is granted.

10             MR. LYNGKLIP:  Thank you.

11             MR. KOPP:  And if there are none, then we'll let you

12   know.

13             THE COURT:  If there are none, I wish you would have

14   said there are none, but --

15             MR. KOPP:  We gave them the raw data that had

16   received from the Michigan Department of Corrections.

17             THE COURT:  But the raw data is not -- that does

18   not -- it doesn't ask for produce the raw data, it asks for if

19   there's contracts or agreements and the existence or absence of

20   such an agreement could be relevant.  All right, so anyway

21   eight is going to be required to be answered and if the answer

22   is that no such documents exist, then that answer is fine, but

23   it needs to be provided.  All right.

24             MR. LYNGKLIP:  Nine was not at issue 'cause they

25   answered that.

```
1              THE COURT:  Right.

2              MR. LYNGKLIP:  This is the documents under which they

3    have acquired public records information, we need that.

4              MR. KOPP:  Again, your Honor, the breadth of that

5    request is just significantly overbroad.

6              THE COURT:  Why can't we limit it just to the states

7    in question here?

8              MR. LYNGKLIP:  I'm happy to do that, your Honor, for

9    within the state of Michigan?

10             THE COURT:  Didn't you also say Ohio?

11             MR. LYNGKLIP:  And Ohio, yes, and actually there's

12   actually another conviction from Winder, Georgia, so that would

13   be Ohio, Georgia and Michigan.

14             THE COURT:  All right.

15             MR. KOPP:  I don't know if that one was reported.

16             MS. BOLOS:  I don't believe there --

17             MR. LYNGKLIP:  The Winder one?  Okay, yeah.

18             THE COURT:  So Ohio and Michigan?

19             MR. LYNGKLIP:  Yes, your Honor.

20             THE COURT:  All right, fine.  That will resolve 10.

21   11?  All right, that's going to be granted.

22             MR. LYNGKLIP:  Great.  12.

23             THE COURT:  And just for the record because this is,

24   this transcript is going to be the Court's ruling in this

25   matter, I'm just going to do a short order that says for the
```

1    reasons on the record.  Request number 11 says all documents

2    that show when, where and from whom CoreLogic purchased,

3    obtained or otherwise procured criminal public record

4    information it reported about plaintiff.  I don't know how

5    there's, could be any relevance objection to that.

6              MR. KOPP:  We didn't object to that on the basis of

7    relevance, your Honor, in the amended response.

8              THE COURT:  It says defendants obtained the

9    information relevant from the consumer reports in question.

10             MR. KOPP:  No.  I'm saying our response in the

11   amended responses that we provided did not object to on the

12   basis of relevance.

13             MR. LYNGKLIP:  So then he's talking about

14   supplemental response they've provided of --

15             MR. KOPP:  Yeah.

16             THE COURT:  All right, but I don't have that, right?

17             MR. LYNGKLIP:  Correct.

18             MR. KOPP:  I know.  I served it on --

19             THE COURT:  All right.  Well, so I'm just looking at

20   the old one.  So anyway, to the extent there's any, maybe

21   there's nothing else to produce, but 11 is granted.  If there's

22   nothing else to produce, you don't have to, you know, you can

23   just indicate that, but to the extent there's still more

24   responsive documents, 11 is granted.

25             MR. KOPP:  Okay.

1           THE COURT:  12.

2           MR. LYNGKLIP:  That's the, umm, that's the, umm, the

3  purchase price, the acquisition price of the data.

4           THE COURT:  For what though?

5           MR. LYNGKLIP: Of the public record data that they're

6  obtaining.

7           THE COURT:  For every single instance?

8           MR. LYNGKLIP:  Well, this would be normally what we

9  would see -- yes in every single instance, but normally we

10  would see that most credit reporting agencies would only have

11  agreements with one, two, or three public records vendors who

12  would get information for them so there will be an overarching

13  contract and would normally be only one or two of those

14  contracts.  If there's more, I understand how that my become

15  unduly burdensome, but my expectation when I requested this was

16  there were only several at most and certainly if you want to

17  limit it to Michigan, I'm happy to take that limitation.

18           THE COURT:  All right.  Then I'll limit 12 to

19  Michigan and Ohio.

20           MR. LYNGKLIP:  Ohio, yeah.

21           THE COURT:  All right.

22           MR. LYNGKLIP:  13 is the data vendor acquisition

23  vetting.

24           THE COURT:  All right.  I'll grant 13.  Again, I

25  think that goes right to the -- you know, that's probably just

1   a couple of documents, right?  I mean, I'm assuming it's not,

2   umm, some massive manual or things like that, but they've got

3   to have some kind of training materials or other similar-type

4   materials for their staff as to how they evaluate data vendors,

5   if at all.  All right.

6           MR. LYNGKLIP:  And your Honor, we have a supplemental

7   in their supplemental response, they've actually objected to

8   that on the grounds of attorney/client privilege --

9           MS. BOLOS:  No, no --

10          MR. LYNGKLIP:  Oh, I'm sorry, that's 11?  I'm sorry,

11  we went back.  I apologize, your Honor.

12          THE COURT:  Well and just to be clear, I'm not

13  requiring them to produce things that are legitimately

14  attorney/client privilege material.  You'll have to do a

15  privilege log for that.  I'm just really speaking to the issues

16  that were raised in the motion --

17          MR. LYNGKLIP:  Correct.

18          THE COURT:  -- as to relevance, overbreadth, things

19  like that.  All right.  14, all documents relating to your

20  methods of obtaining public criminal, public record criminal

21  data.  That is very specifically germane to the issues in this

22  case so that will be granted.

23          MR. LYNGKLIP:  This is the matching algorithms and

24  procedures that would match Randy Reeds to Randy Cleary.

25          MR. KOPP:  With respect to number 14 you're saying?

1              MR. LYNGKLIP:  I'm sorry.  I thought we were on 16?

2              THE COURT:  15 now.

3              MR. LYNGKLIP:  Oh, I'm sorry, 15.  Yes, these are

4    part of what you -- 15 and 16 go together.  So 16 is actually

5    the algorithms and there is a, umm, let me put it to you this

6    way.  If were you to request a credit report or background

7    check concerning anybody, you'd log into a web page and you'd

8    key in the data that you want to match so if you wanted my

9    consumer report, you'd say Ian Lyngklip.  You might be required

10   to provide other identification information about me that would

11   enable them to match a search with the records that they have

12   on file.  So for purposes of, you know, the major credit

13   reporting agencies, I'm very familiar with their matching.

14   They have a minimum of you've got to provide a name and you've

15   got to provide some other like a minimum of either a soesh or a

16   date of birth to be able to track that back to them, right?  So

17   the, this defendant would have to have similar matching

18   protocols to say there's a minimum amount of information that

19   you're required to get so what we want to see is not only the

20   processes and how they actually track that internally once they

21   have those search criteria, but also the minimum requirements.

22             THE COURT:  But I guess my concern is you say any

23   document concerning and so that is, I mean, I'm happy to order

24   them to produce like if they have some kind of manual that

25   describes this or some kind of, you know, overarching memo

1    that, umm, that contains the information you need, but the way

2    it's phrased, it would be I think too broad to require any

3    document concerning those matters.

4         MR. LYNGKLIP:  I understand exactly what you're

5    saying, your Honor, and to be clear about what we think that we

6    would need from that and I will make sure that we get that

7    corrected and don't tender that again, umm, we would normally

8    see the documents that we're really looking for would be things

9    like business analyst rules so that is how that this would be

10   promulgated is that a company like CoreLogic would have a

11   business analyst create plain language rules that they would

12   then hand off to either a software engineer or a computer

13   programmer and those people would then translate those rules.

14   Those might also be in a manual so those would be the two

15   things that we would actually be looking for.

16        THE COURT:  Same for 16?

17        MR. LYNGKLIP:  Those are -- yes.

18        THE COURT:  All right.

19        MR. LYNGKLIP:  Yeah, exactly.

20        THE COURT:  Let me hear from the defense.  You

21   understand what Mr. Lyngklip is looking for there?

22        MR. KOPP:  I do, but I think that if there are

23   documents that identify what that minimum identifying criteria

24   is, name, date of birth that we use that, once we identify that

25   in a document, then I think that sufficiently responds to the

1    request.  I'm not sure that they need additional documents or,

2    you know --

3            THE COURT:  Well, but I want them to have like to the

4    extent there is a high-level single document that describes

5    what is CoreLogic's system for doing this whatever, you know,

6    it does, whether that's in manual or a memo or, you know, some

7    training material, I agree, I don't want your client to have to

8    produce every single time any, you know, any of these things

9    come up in a document or would have to search for them, but

10   there's got to -- if there's some centralized kind of document,

11   that's what they need to produce.  All right, 17?

12           MR. LYNGKLIP:  Yeah and these would be the training

13   manuals that describe that, but I think that that's subsumed

14   within what your Honor just ordered, so I think that is taken

15   care of.

16           THE COURT:  All right.

17           MR. LYNGKLIP:  And I think 18 falls into that same

18   category.

19           THE COURT:  All right and 17 and 18 will be granted

20   to the extent I think it's, umm, plaintiff has proffered that

21   he understands those will be subsumed within the answers to 15

22   and 16 provided that CoreLogic answers them in the way that

23   we've discussed.

24           MR. LYNGKLIP:  Yes, your Honor.

25           THE COURT:  All right.  19 then should be the same?

1          MR. LYNGKLIP:  Yes.

2          THE COURT:  It says compliance with FCRA?

3          MR. LYNGKLIP:  Yeah, umm, right and that will be the

4    same which takes us to 20, instructions to people who are

5    updating court records.  I'm not sure if -- these requests were

6    tendered at a time when we were still thinking that these were

7    court records.  I assume that we have a stipulation that these

8    were not actually taken from the court now for from Mr. Kopp;

9    is that correct?

10         MR. KOPP:  That's correct.

11         MR. LYNGKLIP:  So I think that we'll accept it.  We

12   don't need that at this point.

13         THE COURT:  Okay, so would that be then the same for,

14   let's see, 20?

15         MR. LYNGKLIP:  That's 20 is what I was actually

16   requesting, your Honor.

17         THE COURT:  Oh, I'm sorry.  Okay, then 20 you're

18   okay, you don't need any ruling on.

19         MR. LYNGKLIP:  Correct, your Honor.

20         THE COURT:  21, I would grant 21 other than, you

21   know, if it's attorney/client privileged or attorney work

22   product, those would not need to be produced, but otherwise

23   that certainly could have relevant information about what

24   CoreLogic understood to be any kind of issues with the way that

25   it reported criminal or public record matters and so therefore

1    I think that's relevant.

2         MR. LYNGKLIP:  Your Honor, to the extent that they

3    are privileged materials, I assume that your Honor's directing

4    them do that within a privilege log?

5         THE COURT:  Yes, as I said, yep.

6         MR. LYNGKLIP:  Umm, 22 is reports of, reports to

7    their regulators and shareholders and corporate officers

8    reflecting identity theft incidents within their data.

9         MR. KOPP:  Again, your Honor, we would take the

10   position again that that's overly broad and it may be that

11   it's, you know, that for other identity theft situations, they

12   may not have received the information specifically from the

13   same source that was it received for Mr. Cleary so I think if,

14   you know, if it was limited to information obtained through the

15   same source that CoreLogic used to identify the criminal

16   information that it was reported for Mr. Cleary, that would be

17   appropriate.

18        MR. LYNGKLIP:  If I may?  Your Honor, to my thinking,

19   if the information is important enough to deliver to

20   shareholders, owners and officers, it's important enough for

21   the jury to hear so if they've made a decision internally that

22   they're not making money because of, umm, because of identity

23   theft or that it's impacting their ability to do business,

24   that's notice to them that they've got a problem and whether

25   it's delivered to shareholders or to officers or executives,

1   whoever it's delivered to, that is notice and that should be

2   given to the jury.  So for instance if they've written a memo

3   to the board of directors saying incidents of identity theft is

4   is way up, we need to write a disclaimer and not actually

5   guarantee the accuracy of our reports anymore.  By the way,

6   that is actually in the subscriber agreements that they've

7   provided which says that they do not guarantee the accuracy of

8   their reports, but if that's a result of identity theft or or

9   something like that, that would be a cue to jury that this

10  company is selling data that they know is, is impaired and so I

11  think that that is not outside the bounds of what's relevant

12  and necessary to prove willfulness in this circumstance and I

13  would hope that there wouldn't be that many of these memos

14  where they are notifying shareholders, directors and officers,

15  but if there are, that would again in and of itself be

16  important information for the jury.

17          THE COURT:  I guess my question is though about when

18  you say known problems of identity theft or fraud, what

19  happened here was so specific, right, in connection with a

20  criminal action.

21          MR. LYNGKLIP:  Actually it's not and that's really

22  the point as Ms. Bolos could probably describe for you and I

23  took the same deposition, you know, with the Haynes case four

24  years ago.  Many of these data sources are riddled with the

25  same kinds of information.  The problem of having an offender

```
 1    not want to be habitualized or recidivized and assuming
 2    somebody else's identity is one of the most common problems
 3    that there is in the criminal justice system tracking down
 4    people which is why they're trying to move everybody onto
 5    fingerprints.  I mean, I think the city of Detroit only got
 6    fingerprinting maybe within the last five years and access to
 7    the NCIS database.  You know, the reality is that this is a
 8    major problem and to the extent that corporations have
 9    knowledge of and they're buying or acquiring data from
10    publicly-available sources, it is up to them, incumbent upon
11    them to make sure that that data source is reliable and if
12    they've got memos suggesting that any variety of data sources
13    like for instance department of corrections data from all over
14    the country, you know, memo to all production managers, we're
15    going to stop selling this data until we, you know, recognize,
16    been able to vet this data.
17              THE COURT:  As I said, I would agree to the extent it
18    intersects in some way to the facts of this case where it
19    involves a criminal case or an offender --
20              MR. LYNGKLIP:  Okay.
21              THE COURT:  -- I would agree, but I think that just
22    in general to say you want them to produce all these documents
23    related to known problems of identity theft is just, that to me
24    is really broad and much broader than a criminal defendant
25    usurping the name of somebody else.
```

1          MR. LYNGKLIP:  I'm happy to take that out of the

2     discovery with the limitation your Honor just placed on it.

3          THE COURT:  All right.  So it will be, the request

4     will be granted subject to the reports and documents being

5     related to, you know, the criminal context, all right?

6          MR. LYNGKLIP:  That's --

7          THE COURT:  Although just for the record I sit in

8     Detroit one week every five and here probably 20, 15 criminal

9     cases every day during that week and I've only maybe seen one

10    or two where the person, where they don't know who the person

11    is and the person's not given his own name, and but that's just

12    an anecdote, but --

13         MR. LYNGKLIP:  I would just so your Honor's

14    experience doesn't necessarily translate over, again, they're

15    dealing with U.S. marshals who have direct access to the

16    federal NCIS database and have biometric matches available and

17    fingerprinting readily available to them.  Having people come

18    into the court and try to lie about who they are to the FBI is

19    a different thing than trying to lie to the Canton police

20    department or the Redford Police department which is what

21    happened in many of the instances of these cases is, you know,

22    these things are all being initiated out of district court

23    where there's no vetting of any of this happening, so I totally

24    understand that experience for your Honor and I would agree

25    that would be par for the course in Federal Court, but in a

```
 1    city like Detroit where they didn't have access to fingerprint
 2    matching technology until very recently, this was a huge
 3    problem and remains so throughout the country in many other
 4    resource areas.
 5              THE COURT:  All right.
 6              MR. LYNGKLIP:  Administrative complaints for
 7    violation of FCRA -- oh, I'm sorry, I think 23 is the same as
 8    for 22, your Honor, would need to be limited the same way.
 9              THE COURT:  All right.  Again, limited to criminal
10    cases and again that one specifically calls for legal
11    memoranda, so again just highlight that I'm not requiring any
12    privileged materials to be produced.
13              MR. LYNGKLIP:  Thank you.  Then 24's administrative
14    complaints against CoreLogic.
15              THE COURT:  All right.  Those are all public record.
16    Those can be produced.
17              MR. LYNGKLIP:  Thank you.  25 is instructions for
18    compliance with EB which is the claim in this case.
19              THE COURT:  All right.  That will need to be
20    produced.
21              MR. LYNGKLIP:  Cost benefit for preparation of
22    consumer reports which is 26.
23              MR. KOPP:  Again, subject to privilege.
24              THE COURT:  All right, fine.  Subject to privilege
25    that can be produced.  27 though, your annual budget for
```

1    litigation and settlement of cases involving of FCRA claims?

2         MR. LYNGKLIP:  Yeah.

3         THE COURT:  What is that?

4         MR. LYNGKLIP:  Well, your Honor, I can tell you that

5    one of -- the anticipated use at trial would be something along

6    the lines of what you might have heard of as the Pinto let 'em

7    burn memo.  So the question is does, you know, does this

8    defendant make a decision that it's cheaper to defend these

9    cases and to settle these cases out rather than to go to the

10   expense or have to take a hit to their actual production of the

11   product and correct the problem.  So that's the picture that we

12   want to paint is that they could easily screen out this data

13   and not sell the data that they they think is impaired, but

14   maybe they've made a decision that hey if it only costs us a

15   million dollars and we're making 25 million dollars on these

16   materials, why should we change?  We'll just pay the lawsuits.

17        THE COURT:  All right.  I don't need to hear from the

18   defense on this and I'm not going allow 27.  I think that,

19   number one, that goes -- there's no way to really divorce that

20   from an attorney/client-privilege-type analysis because that's

21   going to be a determination that's made along with the advice

22   of the attorneys and it involves litigation and secondly, I

23   have ordered the production of all the financial information.

24   I think you can make, you know, a higher-level argument and

25   maybe not quite as detailed as what you'd want to make, but

1    it's also I think, umm, that's all that would be re -- you

2    know, that's all that's required is the plaintiff be able to

3    show the financial resources of the defendant and that the

4    defendant ostensibly could have allocated its resources

5    differently rather than getting into the specifics of any kind

6    of set asides for litigation or settlements, so I'll deny 27.

7              MR. LYNGKLIP:  Understood, your Honor.  Employee

8    records for people preparing reports for plaintiff.  I don't

9    know that in fact there are actually any people.  You know,

10   sometimes records checked work is actually person work and

11   there are some companies that do this.  Personally I don't know

12   whether there is actually a person or whether it's just an

13   automated process.  If it's an automated process, there's

14   nothing here to produce and I'd leave that to your Honor.

15             MR. KOPP:  That's correct, your Honor.  It's

16   automated.

17             THE COURT:  All right.  Well, then you can just

18   answer it that way.  All right.

19             MR. LYNGKLIP:  Bulletins and manuals concerning

20   accuracy to furnishers.  Again, this goes back down to the

21   issue of whether or not they're taking adequate precautions to

22   ensure that they've got accurate data in the system and whether

23   there's an overall, I want to say an overall culture of

24   compliance or whether or not they're just letting these people

25   produce whatever they want to produce.

1           THE COURT:  All right.  Well, it does say it is

2    related to the furnishers of credit information at issue in

3    this case --

4           MR. LYNGKLIP:  Correct, your Honor.

5           THE COURT:  -- and so it's fairly narrow and so those

6    would be with third parties?

7           MR. LYNGKLIP:  Yes, people who are actually

8    furnishers and have furnisher agreements.  To the extent that

9    they're scraping the data from OTIS and taking the data rather

10   than being given the data, that wouldn't apply to OTIS, but,

11   you know, if they have other furnishers whose data they

12   provided concerning Mr. Cleary, that would make an app -- umm,

13   an appropriate acquisition.

14          THE COURT:  All right.  Earlier the request had

15   sought information going back I think three years for the most

16   part, so that should be sufficient?

17          MR. LYNGKLIP:  Yes, your Honor.

18          THE COURT:  All right.  Then I'll limit it to three

19   years for 29 because that was one of the objections is that it

20   went back too far.  All right, 30, the, any document explaining

21   the meaning of abbreviations, codes?

22          MR. LYNGKLIP:  Yes, your Honor.  This is absolutely

23   necessary.  Virtually all of the internal computer documents

24   that they've got about how things are processed are coded.

25   They're heavily coded.  They've got computer instructions in

1   them and we have no way of translating these and effectively

2   what that means is that the doc means anything that a witness

3   wants it to mean on the stand.  If there's a standardized

4   format for interpreting coded records, we need to see that.

5          THE COURT:  All right.  Counsel, I assume if you have

6   that, great.  If you don't have that, then I guess you can

7   either ask the 30B6 witness all of those codes or maybe have an

8   interrogatory that just asks them to define them.

9          MR. LYNGKLIP:  We actually have tendered that

10  interrogatory and we're going to visit that interrogatory

11  later.

12         THE COURT:  All right.  So 30 will be -- but I may

13  grant 30, but only if there's like a document.  I mean, they

14  don't have to go through like finding, look through a million

15  different documents to try to find --

16         MR. LYNGKLIP:  They don't have to create it if this

17  doesn't exist, your Honor.  If it already exists --

18         THE COURT:  I know, but it they have one document,

19  one needle in a haystack that happens to define one of the

20  codes, they don't need it look for, so if you have like a

21  definitions page.

22         MR. LYNGKLIP:  And that's exactly what we would be

23  hoping to find is that normally it a user manual there would be

24  a definitions page for those or they might be find in a data

25  dictionary or data schema.  Either one of those two things

1    would normally have to something like that.

2            THE COURT:  All right.  As long as it's something

3    like that like a single document, that's fine.  All right, 31?

4            MR. LYNGKLIP:  Is the transcripts of the 30B6

5    witnesses.

6            THE COURT:  In other cases?

7            MR. LYNGKLIP:  Yes, your Honor.  We have, we have

8    found that these 30B6 witnesses tend to, I want to say we might

9    argue that they conform their testimony to, to fit the case

10   that they've got and they provide very fruitful, umm, very

11   fruitful cross-examination.

12           MR. KOPP:  And again just objecting on the basis of

13   overly broad, your Honor.  I don't even know that there's a

14   repository of 30B6 deposition transcripts available that we

15   would be able to identify all the 30B6 depositions that have

16   been taken by CoreLogic's representatives.

17           MR. LYNGKLIP:  Your Honor, CoreLogic has been

18   represented in, well, in virtually every case that I've had

19   with them and everyone that I'm aware of throughout the country

20   and previous, they were represented by an attorney by the name

21   of Ron Raether (phonetic) previously, I don't know where he was

22   before, but he's now been front and center.  They've been

23   represented by the same counsel and the same national counsel

24   for years and years and they have, you know, these records are

25   in the hands of their attorneys and they should be able to turn

1    these over right away.  This should not be a very difficult

2    process.

3            MR. KOPP:  Again, even just the relevancy of it.

4            THE COURT:  Yeah, I just, I've never seen a request

5    like this where you ask for a witness' prior 30B6 depositions.

6    We don't know what those depositions were on, what they were

7    regarding, what kinds of, you know, cases and if anything has

8    changed since now or then and, you know, you have a right to

9    ask their 30B6 witness any questions you want about their, you

10   know, the topics which you identify in the 30B6 notice and,

11   umm, you know, so I think that would go too far in the type of

12   information that you're asking.

13           MR. LYNGKLIP:  Thank you, your Honor.

14           THE COURT:  So 31 is denied.

15           MR. LYNGKLIP:  Shareholder reports of past

16   litigation.

17           MR. KOPP:  Again, your Honor, we would just argue

18   about the scope of that request.  I mean, I think it's, you

19   know, doesn't really define type of litigation and where

20   temporal boundaries.

21           MR. LYNGKLIP:  And I would limit that to the past

22   five years, your Honor, but I would say this, that ultimately

23   the things, the kinds of things that CoreLogic reports up to

24   its shareholders would be important for the jury to see that in

25   light of and there are a lot of cases against CoreLogic, that

1    in light of that and the past history of litigation, that none

2    of that past litigation to consumers ever makes it to the board

3    of directors and the only things that they seem to take notice

4    of are problems with their customers which is not the

5    consumers, the customers are people they're supplying.

6         THE COURT:  But I've already ordered them to produce

7    and there have already been or document requests that speak to

8    this issue like reports and disclosures to agencies and, so --

9         MR. LYNGKLIP:  To the extent it's duplicative, I'll

10   take what your Honor has already given me.

11        THE COURT:  All right.

12        MR. LYNGKLIP:  33 is the insurance policy.  Again, I

13   think we're absolutely entitled to that, not just the dec page.

14        MR. KOPP:  We already responded --

15        THE COURT:  They say they don't have any.

16        MR. LYNGKLIP:  Umm, well, apparently they have --

17   they do have something 'cause they gave us this dec page on

18   Friday.  Was it Friday?

19        MS. BOLOS:  Yes.

20        MR. LYNGKLIP:  Yeah, on Friday they gave us a dec

21   page for a policy, so there's actually a policy.

22        MR. KOPP:  My understanding is there's no insurance

23   coverage that would be applicable based on the allegations in

24   this complaint.  I think the dec page is of the general

25   liability policy.

1          THE COURT:  Well, I forget -- doesn't Rule 20, umm.

2          MR. LYNGKLIP:  26(a)(1).

3          THE COURT:  Yeah, 26(a)(1) disclosure requires the

4    disclosure of insurance that might cover the claim and so if

5    they're contending that it does not cover the claim, they

6    wouldn't need to produce it.

7          MR. LYNGKLIP:  Well, I think that --

8          THE COURT:  But I --

9          MR. LYNGKLIP:  -- I understand exactly what you're

10   saying, but if there's a policy within which this might cover

11   it, there's plenty of case law dealing with the idea that

12   defendants self-edit this in order to avoid disclosure to their

13   insurance companies of a claim that would actually be covered.

14   So, I mean, I can -- I mean, I've been in this Court dozens of

15   times with defense saying we have self-retention, we're not

16   tendering a claim, therefore there's nothing that covers it.

17   They don't get to make that choice.  If, you know, if it's an

18   auto no fault policy, I get it, I completely get it, but they

19   have a general business policy that covers claims against

20   product, umm, product liability or liability for violations of

21   the FCRA.  The fact that they self-determined that this might

22   not cover, that's not, that's not an appropriate response.

23         THE COURT:  So I'm just looking for the provision in

24   Rule 26 that requires disclosure of insurance policies.

25         MR. LYNGKLIP:  I know it's been -- it's 26(a)(1) sub

```
1    4.
2              THE COURT:  Yes, thank you.  Any insurance agreement
3    under which an insurance business may be liable to satisfy all
4    or part of a possible judgment in the action and the defense's
5    response was defendant has no insurance coverage that would be
6    applicable based on plaintiff's allegations so I, I mean, that
7    doesn't actually track the language.  So I guess all I would do
8    is just order, you know, Rule 26(a), the provision we were just
9    discussing, (a)(1)(a)(4), it needs to be complied with and so
10   to the extent that that insurance policy might make the
11   insurance business liable to satisfy a judgment, it needs to be
12   produced, the policy, but I mean, I can't say whether it does
13   or doesn't without --
14             MR. LYNGKLIP:  Without seeing the policy.
15             THE COURT:  Without seeing it.  I don't even know if
16   I could make that determination if I did see it.
17             MR. LYNGKLIP:  Understood, your Honor.
18             THE COURT:  What is the dec page that you've been
19   provided show?
20             MR. LYNGKLIP:  It shows that they have a general
21   liability policy and a stop gap liability policy.  I don't know
22   what that is, but, you know, I would take a dec, a
23   certification from counsel that this is, there's no FCRA suit
24   that has been or could be tendered under this policy.  I think
25   that would be plenty good.
```

1           MR. KOPP:  I can get that.

2           THE COURT:  All right, fine.  That resolves that.

3   30.  34 is just, I mean, they have their own, umm, disclosure

4   obligations and --

5           MR. LYNGKLIP:  And that tracks also for 30 -- number

6   35 -- oh, yeah, right, I'm sorry.  This is not actually a

7   subject of the motion.  It's not at issue.

8           THE COURT:  All right, great.

9           MR. LYNGKLIP:  And that would probably be the same

10  for number 35 or 34 and then --

11          THE COURT:  And 36 I think.

12          MR. LYNGKLIP:  Yeah and then 36 is any expert

13  witnesses that they've retained them.  So, I mean, I understand

14  that that's not at issue as well.

15          THE COURT:  All right, great.  So that covers that

16  entire motion.  Let's see.  The interrogatories, do we need

17  separate argument on that or it seems like it's very similar.

18  I had actually kind of intended to cover them all, both of

19  those at the same time.

20          MR. LYNGKLIP:  Umm, yeah.  I'm sorry, before we leave

21  the production, there was one last thing that just came to

22  light on Friday when we got the supplemental production.

23          THE COURT:  All right.

24          MR. LYNGKLIP:  We did specify the format for, for

25  this production.  We did ask for where available native format

1    documents, PDFs that if they have them in PDFs, we want their

2    original PDFs with all their metadata intact.  We received

3    200-odd pages of manuals that had been printed and rescanned.

4    That is not what we asked for and certainly does not conform to

5    the requirements of the Rule.  We would ask that they reproduce

6    those documents and that any production that they give us

7    conform to the requested formats and, umm, that they not

8    actually print them and rescan them.

9            THE COURT:  From manuals?

10           MR. LYNGKLIP:  Yes.

11           THE COURT:  All right.  Counsel, do you know, do you

12   have those available in some kind of native format?  I mean --

13           MR. KOPP:  I don't know, your Honor.  I received them

14   the way we produced them.

15           MR. LYNGKLIP:  Your Honor, normally these manuals are

16   maintained online on a website in a PDF format and it's as

17   simple as actually copying those manuals from their PDF to

18   that.  Now normally the practice has been for defendants to

19   again as I say print them to a printer and rescan them so that

20   there is no ability for anybody to get at the metadata that's

21   actually buried in those documents.  That's why we asked for

22   this.  The idea that if they've got documents, they have to

23   have them in a native format.  They were prepared either using

24   MS Word or a design program and they were printed to probably a

25   PDF or an HTML page.  Those are there and available.  The

1    printed formats that they give us are absolutely or, yes,

2    either they're effectively useless.

3            THE COURT:  Well, other than the substance that they

4    contain.  Mine, unless you think they've been altered.

5            MR. LYNGKLIP:  Well, they've been altered to limit

6    they're usefulness to me.  Specifically, they're not text

7    searchable so it's just an image so it's like they've got the

8    ability to look through this and key search through this and

9    look for words and phrases and have this at their disposal and

10   I got to rely on an OCR and I've got to reprocess all of these

11   documents which is now you difficult because they've got a big

12   confidential brand across the top all across the page that's

13   going to limit our ability to do this and that's exactly what

14   it's designed to do.

15           THE COURT:  All right.  If they have them in format,

16   you know, I mean, that should be just as easy to produce,

17   probably easier in some respects than photocopying them and

18   Bates labeling them, they can produce them.  I just don't

19   know what -- if they don't have it in that kind of format,

20   then they don't, but if you do, then they should be produced

21   that way.

22           MR. LYNGKLIP:  Thank you, your Honor.  So then as to

23   the interrogatories, these, umm, some of these are going to

24   track over, but, I mean, when we start at the front end of

25   these things, we start with some contention interrogatories

```
 1   that we need to have answered that we're entitled to have
 2   answered as a first instance like finding out whether they're
 3   going to concede that the reports are inaccurate and that
 4   they're inaccurate in relation to Mr., Mr. Cleary.  Having
 5   those objections is not helpful.  That's interrogatory number
 6   one.  Identifying products and services that they sell that's
 7   not covered in any of the production requests, that that is
 8   again something that's at risk for Mr. --
 9              THE COURT:  All right.  We're going to take a short
10   break and I want you guys to talk about these interrogatories.
11   I think you've got to be able to in light of the rulings that
12   I've already made on the substance of the motion for production
13   to be able to resolve, hopefully resolve most if not all of
14   these in just a, you know, 10 minutes.  We've been going for an
15   hour and 45 minutes anyway so just take a short break.  You can
16   talk about some of these things and we'll come back on the
17   record in like 10 minutes.
18              MR. LYNGKLIP:  Can we say, umm, build in five minutes
19   for me to use the --
20              THE COURT:  Yes.  We'll come back at noon.
21              MR. LYNGKLIP:  12 straight up?
22              THE COURT:  All right, thank you.
23              MR. LYNGKLIP:  Thank you.
24              THE CLERK OF THE COURT:  All rise.  Court is briefly
25   adjourned.
```

```
 1                    (Recess taken at 11:44 a.m.)

 2                    (Reconvened at 12:03 p.m.)

 3              THE CLERK OF THE COURT:  Please rise.  Court is back

 4     in session.

 5              THE COURT:  All right.  How do we look?

 6              MR. LYNGKLIP:  Better than we looked when you went

 7     out that door.

 8              THE COURT:  Good.

 9              MR. LYNGKLIP:  So I'm going to give you the very,

10     very short answer of this which is that there's only two

11     interrogatories that remain in dispute.

12              THE COURT:  Okay.

13              MR. LYNGKLIP:  Which are interrogatories number six

14     and 16.  I don't know if we need to make a record of, of the

15     others, but I will say this, that plaintiff withdrew better

16     than half of the ones that are at issue because we've been

17     given documents that tracked what those are and Mr. Kopp has

18     agreed to withdraw his objections to several of these and we're

19     going to live with the answers and the only one that requires

20     some additional attention is interrogatory number 18 which is

21     as to authoritative treatises for experts.  We don't -- Mr.

22     Kopp has indicated that he has not yet retained an expert and

23     therefore there's no data to provide or information or answer.

24     He will answer -- withdraw his objections and provide

25     supplemental information when and if he gets an expert.  Fair
```

```
1    to say?
2              MR. KOPP:  Fair.
3              THE COURT:  Okay.
4              MR. LYNGKLIP:  Do we want to go through each of these
5    so you know what we're doing or?
6              THE COURT:  No, I trust you to, you know, you'll
7    memorialize your agreement between yourselves and I'm sure I'll
8    hear from you if there's a problem.
9              MR. LYNGKLIP:  We will -- Mr. Kopp, is it okay if we
10   summarize that with a stip and order?
11             MR. KOPP:  Sure.
12             MR. LYNGKLIP:  So we have three attorneys who all
13   took notes.  I think we can get that in front of you without
14   too much trouble, so I appreciate the direction you gave us
15   with the production requests and now we can move to the last
16   thing which is the 26(a)(1) motion.
17             MR. KOPP:  Well, do you want to address six and 16?
18             MR. LYNGKLIP:  Oh, I'm sorry, I forgot.  Yes, we
19   actually have something at issue here.  I was anxious to move
20   forward.  So that's -- so number six is, umm --
21             MR. KOPP:  All lawsuits that have been filed --
22             MR. LYNGKLIP:  Yeah.  So number six is seeking the
23   lawsuits that are limited to allegations where there's an
24   issuance of a report and it's about another individual.  So
25   effectively this is only lawsuits dealing with consumers who
```

1    claim that they've been misidentified as committing a crime.

2    So, tracking to the specific facts of this case.  So that's

3    what we're looking for is for information about, umm, those,

4    those individuals where there's a case that's been filed and

5    any settlement or judgment that's paid on that.

6              THE COURT:  All right.  Let's hear from the defense

7    on this one.

8              MR. KOPP:  Sure, your Honor, and again six and 16 are

9    kind of go hand in hand.  Six is the, they're asking us to

10   identify the dispute or the lawsuits involved in a report

11   containing data attributable to more than one person or about

12   another person and 16 is any settlements or judgments paid in

13   any lawsuits in which they were alleged that have improperly

14   prepared a consumer report and again our objection is that this

15   is or these are overly-broad both as to scope and as to time.

16   They're not relevant to the issues that are alleged in the

17   complaint and as to the settlements, many of the settlements

18   are confidential.

19             THE COURT:  Well, let's first just talk about the

20   substance, not the settlement because I agree that that's a

21   different issue, but in terms the request itself for cases, if

22   there are other cases that where, where it involved facts

23   similar to this with a criminal matter, why is that not

24   relevant to see well that at least to know that the,

25   potentially that the defendant was aware of this potential

1    issue and therefore on notice that, you know, maybe what it was

2    doing wasn't sufficient.  If it's a criminal case where they

3    used the similar type.

4         MR. KOPP:  Right.

5         THE COURT:  And I understand that's not the way

6    the -- I don't see that's the way the interrogatory's worded.

7    I think the interrogatory's worded much more broadly than that

8    because it just says, it just talks about, umm, it just talks

9    about an individual where there was, where you are alleged to

10   have improperly issued a report containing data attributable to

11   more than one person.  That's maybe or that is much broader

12   than what Mr. Lyngklip, what I heard him offer a more narrow

13   request related to where the consumer in question is confused

14   with a different criminal defendant or offender.

15        MR. LYNGKLIP:  Right.

16        THE COURT:  Which would to me that would really bring

17   into bear issues relevant to this particular case.

18        MR. KOPP:  I'd have less of an issue with that,

19   especially if it didn't contain the judgment or settlement as

20   requested.

21        THE COURT:  All right.  So, well, let's first talk

22   about just the, so I will grant six with respect to, as to the

23   first part with respect to cases where the subject of the

24   report is complaining about being confused with a, you know, a

25   criminal defendant and, you know, again I think that is

```
 1    relevant here.
 2            MR. KOPP:  Within a time period, your Honor?
 3            THE COURT:  Yes, so go ahead.
 4            MR. LYNGKLIP:  Five years, your Honor?
 5            THE COURT:  Is that okay?
 6            MR. KOPP:  Sure.
 7            THE COURT:  Okay, all right.  Five years seems fine,
 8    and then so I think case, case name, number, venue, you know,
 9    et cetera is sufficient, but I would, umm, and if there is a
10    judgment that is, you know, part of a public record, then I
11    would agree that ought to be produced.  I will not order the
12    production of any settlement amount though, umm, because I do
13    think those are, umm, I guess I'm assuming it has like a
14    confidentiality provision in it and, you know, if that's the
15    case which I assume it would because I think every case I've
16    settled with private parties has had one, then the defense
17    could just indicate that, umm --
18            MR. LYNGKLIP:  It's a confidential settlement.
19            THE COURT:  A confidential settlement not to be
20    produced, all right?  And so then 16- --
21            MR. LYNGKLIP:  That should resolve that for us as
22    well, your Honor.
23            THE COURT:  Okay.  So that resolves that motion.
24            MR. LYNGKLIP:  Great, which takes us to Rule 37 C.
25    That's number two.
```

```
1              THE COURT:  All right.

2              MR. LYNGKLIP:  Okay.

3              THE COURT:  And given that you now have this

4    extension of the dates, if they give you the names, does

5    that -- is there anything else we need to argue about if I

6    order them to just identify who it is we're talking about?

7              MR. LYNGKLIP:  Your Honor, well, I'm -- I think --

8              THE COURT:  I mean, if you have additional time to do

9    whatever discovery you need and ask the right people the right

10   questions, I mean --

11             MR. LYNGKLIP:  So let me just say my short piece on

12   Rule 37.  We filed those motions together because of the

13   dilemma, the inherent dilemma that we have which is we don't

14   know witnesses and we either need to exclude them under Rule 37

15   or we need to have them in a chair and know who they're going

16   to be and what they're going to testify to.  Inherently, I

17   understand completely that the way that this system is designed

18   to work and what we have given our oath to make sure works is

19   that when we can, we want to get to the merits of the claims

20   including the defenses and I'm good with that.

21             What I would like to see out of this motion at this

22   moment 'cause your Honor's given me pretty much everything that

23   I need that would track to Rule 26(a)(1), I do need an updated

24   disclosure from them so yes, I've got the identity of

25   witnesses, Mr. Kopp has agreed to give me identity of witnesses
```

1   who know things.  That is not the same as getting a proper

2   disclosure the witnesses which is them telling me which of

3   those people in that broader subset of people who know stuff,

4   which ones they plan to call and what they plan to have them

5   say when they get on the stand.  I think that that's the

6   important part and I will waive the request for the 37C

7   exclusionary remedy at this time to the extent that I can get

8   the description of who it is that they think they're going to

9   produce and what they're going to talk about and get the

10  descriptions.  I mean, I think we've got other documents and I

11  think that the way that the case law reads on the document

12  production is that if they turn it over to us, they can use it

13  so to the extent that we're getting the documents via the

14  request for production, that is not at issue.  So the only

15  thing that would be at issue would be I would want to see a

16  proper supplementation that describes the witnesses which takes

17  us now to the last, the very last part of this which is the

18  time necessary to do it and I know your Honor hasn't written

19  this, this memorandum order yet.  I'm not sure what time frame

20  we're going to get all this information in and, you know, we

21  have been scrambling and working as hard as we can to get a

22  date so that we can get a 30(b)(6) witness in the chair before

23  the New Year's and we only have two months.  Given what the

24  difficulties that we have had in scheduling before, umm, I am

25  deeply concerned that I'm going to get a very large volume of

```
 1   documents right before Christmas and then I'm going to be

 2   scrambling to try and get all of their witnesses into a seat

 3   in, you know, in a month and-a-half when everybody's

 4   effectively indisposed through the first week in January.  So,

 5   umm, so the answer is yes, it's going to be ameliorated with

 6   time.  I'm just not sure the extent to which we can do things

 7   about that.

 8               THE COURT:  Can you agree on an amount of time for --

 9               MR. LYNGKLIP:  I think that we could agree on a

10   further extension.  I just don't know if that's within the

11   Court's, umm, within the Court's referral.  I think we may have

12   asked for more time.  Did we ask for time?  We already did one

13   extension to February 20th, but the only question is whether

14   it's within the scope of the referral to you and whether you

15   have the ability to do that, so I don't know that.

16               THE COURT:  I'm on good terms with Judge Friedman, so

17   I could always call him.

18               MR. LYNGKLIP:  That would make you like everybody

19   else who's ever met him, so --

20               THE COURT:  My first job out of law school was

21   clerking for Judge Friedman, so.

22               MR. LYNGKLIP:  Did you work with Judge Levy?

23               THE COURT:  I came right after Judge Levy.  Two after

24   Barb McQuade, so I would assume -- I can call Judge Friedman's

25   chambers after this hearing.  I would assume that you can get
```

```
 1   any kind of reasonable extension you need in light of what's
 2   happened here today in terms of the orders for the, you know,
 3   that more documents are going to be produced and that you need,
 4   you know, with the holidays, Judge Friedman is pretty
 5   understanding.  So I would assume as long as you're not asking
 6   for the world in terms of time, that you'll be able to work
 7   that out.
 8            MR. LYNGKLIP:  Okay.  Great.  Well, then we'll --
 9   what I'll do is we'll confer with Mr. Kopp after we've got the
10   order in place and we will make a proposal and circle back with
11   Mr. Butts and maybe have another status conference if that's,
12   that works for you?
13            THE COURT:  All right, that's fine.
14            MR. LYNGKLIP:  Okay, great.  So I don't think there's
15   anything else --
16            THE COURT:  And let me hear from the defense.  I'm
17   assuming you're okay with that or just writing a supplemental?
18            MR. KOPP:  I am or we can just say, you know, 60 days
19   or something that we think would be fine.  We'll talk about
20   that.
21            MR. LYNGKLIP:  I just want to see what the production
22   is going to look like and how long we're going to have to get
23   before they have to give that to us because if it's a lot -- it
24   may be a lot of work for them to get their arms around.
25            THE COURT:  I was going to ask that and I realize I
```

1    had failed to do that.  In terms of the documents that I have

2    ordered to be produced today, is 30 days sufficient or is that,

3    I mean, I know we are, we do have the holidays and I, you know,

4    I'm not trying to jam anybody and frankly I don't think it's an

5    issue.  I think Judge Friedman will give you as I said some

6    additional, you know, reasonable period of time.  So I'm just

7    looking for you to tell me, you know, is 30 days?  I don't want

8    to push it out too far and, you know.

9            MR. KOPP:  I think so, your Honor, but I'd have to

10   talk to my client to find out for sure whether or not they can

11   do that.

12           MR. LYNGKLIP:  You know, I love 30 days.  I don't

13   think that's enough time for them frankly just because I know

14   what's going to happen at the holidays.  Their people if

15   they're like every other corporation they're going to cut them

16   loose early and everybody's going to be useless until after the

17   New Year's and if they are able to get into the pipeline now

18   and get like a week or two is good work out people to get this

19   stuff, they'll still need more time after the New Year's and

20   they would need at least another 14 days and I'm not the guy

21   who's trying to drag my client's case out.  I want to get in

22   front of the jury as quickly as possible, but I also realize

23   that would make life unlivable for opposing counsel and their

24   client and I don't want to do that.

25           MR. KOPP:  That's fair.

1          THE COURT:  All right.  Why don't we just say 45 days

2   for the production and then that will also, you know, suggest

3   to Judge Friedman's chambers why you need more time beyond just

4   the February.  As I said, I don't think you'll have a problem

5   with that.  If anything comes up, you'll let me know and so for

6   all those three motions that we've addressed so far, what I'd

7   like to have happen is you all to submit a stip and order.  I

8   mean, it can be, you know, to the extent there are any

9   objections to it, it's without prejudice to, you know, for any

10  objections, but I'm not going to go through and memorialize

11  everything that we've done.

12          MR. LYNGKLIP:  We'll take care that.  We will take

13  care of that and we'll just, umm, yeah, we'll take care of

14  that.

15          THE COURT:  And you can build in the schedule, too.

16  You can say and proposed, you know, schedule.  You can put

17  something in there that says that, you know, the magistrate

18  judge agreed that more time would be required in light of the

19  results of this hearing, you know, however you want to phrase

20  it is fine.

21          MR. LYNGKLIP:  Great.

22          THE COURT:  And then we need to take -- I wanted to

23  address to hopefully resolve this other motion that was just

24  filed on either Thursday or Friday about the, umm, the

25  confidentiality designations.

```
 1              MR. LYNGKLIP:  Has that been referred yet?

 2              MS. BOLOS:  Yes, it has been referred.  It's not

 3    responded to.

 4              THE COURT:  Yes.

 5              MR. LYNGKLIP:  I hadn't responded.  I was out on

 6    Friday so I haven't had a chance to look at the motion yet,

 7    your Honor.

 8              THE COURT:  Yeah, but it's Monday.  No, I understand,

 9    but I read it and I don't want to have another hearing or phone

10    calls.  I mean, can you -- I mean, there really wasn't anything

11    to the motion other than apprising me that they didn't respond

12    to your attempts to meet and confer which is, I want to just

13    address that as an issue because I think we've shown today all

14    these things, if you guys just would talk more and I'm not

15    pointing the finger at anyone in particular.  I'm just saying

16    and I tried to do that.  I mean, that's why I got you guys on

17    the phone to avoid this and now we've spent two and-a-half

18    hours here.  That motion you've got to be able to figure out, I

19    mean, a reasonable, umm, if it's over-designated, that it needs

20    to be withdrawn and to the extent it's really proprietary

21    information, I don't even know what it is because the motion

22    itself never really got past first base in terms of saying they

23    didn't engage in the meet and confer process.  There wasn't any

24    real discussion of the merits of it, so.

25              MR. LYNGKLIP:  I, just and I'm not asking your Honor
```

1    to point fingers or to take any action against any attorney

2    here.  I'm just saying we really, we had a tight deadline.  We

3    stuck to our deadline and we are trying desperately to get

4    these discovery issues resolved.  We are sending letters that

5    are very detailed and we're making ourselves as available as we

6    possibly can.  We are happy to take another crack at a meet and

7    confer and waive the time limits of their objections if we can

8    have a meaningful conversation with them.  We're happy to do

9    that if you will instruct counsel to make themselves available.

10           THE COURT:  All right.  Anything --

11           MR. KOPP:  I'm available.

12           MR. LYNGKLIP:  Withdrawing the motion without

13   prejudice if that's acceptable to your Honor.

14           THE COURT:  That's fine and or I can enter an order

15   just denying it as moot and ordering a further meet and confer

16   if you --

17           MR. LYNGKLIP:  However you want to do it.  I don't

18   want to appear to be obdurate.  I'm not trying to be obdurate.

19   I'm trying to get this moved along.

20           THE COURT:  No, I understand it should be and that's

21   why I wanted to address it and because the, you know, there

22   needs to be, umm, cooperation and when they write and, you

23   know, and it's especially when the terms of the protective

24   order say five business days, you at least need to send an

25   e-mail back and say and I don't know, maybe you did.  I mean,

```
1    I'm not -- it hasn't been fully briefed and so I'm not making
2    any rulings or anything, but you need to then at least e-mail
3    back and say, you know, five days isn't enough because so and
4    so's out of town or I just need more time or you can't just be
5    radio silent and then leave the plaintiff to well, do they act,
6    do they file a motion, do they not and then if they don't, then
7    there's an argument that well they didn't pursue it quickly
8    enough and so it's just, you know, that's why we have these
9    deadlines in place.  So I'll just enter a very short order
10   denying the motion without prejudice and ordering a, you know,
11   a meet and confer and also, you know, indicating that I think
12   this whole hearing really could have, there were a couple of
13   issues that were of significance that needed to probably be
14   flushed out and hear from the parties on and that are of
15   substantive nature to the claims and defenses, but 90 percent
16   of this could have been avoided, so anyway we'll get that order
17   out on that one.  You guys get me the, umm, stip on the other
18   motions that we resolved along with a proposed schedule and
19   hopefully the next thing we see is more, you know, substantive
20   on the merits, okay?
21             MR. KOPP:  I'll do that.
22             MR. LYNGKLIP:  Thank you, your Honor.
23             THE COURT:  All right, thank you all.  Take care.
24             MR. LYNGKLIP:  Appreciate your time.  You spent a lot
25   of it with us.  I really do.
```

```
1              THE COURT:  All right, yep.  Take care.

2              MR. LYNGKLIP:  Happy holiday.

3              THE COURT:  All rise.  Court is in recess.

4              (Hearing concluded at 12:21 p.m.)

5                         --    ---    --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5

 6

 7           I, David B. Yarbrough, Official Court Reporter, do

 8   hereby certify that the foregoing pages comprise a true and

 9   accurate transcript of the digital voice recording of the

10   proceedings had in this matter on Monday, December 10th, 2018.

11

12

13

14

15   12/16/2018                 /s/ David B. Yarbrough

16   Date                       David B. Yarbrough,
                                (CSR, RPR, FCRR, RMR)
17                              231 W. Lafayette Blvd.
                                Detroit, MI  48226
18

19

20

21

22

23

24

25
```